# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| NICOLE M. BRONSON,<br><br>    Plaintiff,<br><br>v.<br><br>ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL of CHICAGO, an Illinois NFP Corporation, and SUSAN RUOHONEN, In her Individual Capacity,<br><br>    Defendants. | **20 CV_____**<br><br>Hᴏɴ. Jᴜᴅɢᴇ<br>Mᴀᴊ. ᴊᴜᴅɢᴇ |

## COMPLAINT

COMES NOW THE PLAINTIFF, NICOLE M. BRONSON, by and through her counsel, Calvita J. Frederick and Associates, and complaining of the Defendants, ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL of CHICAGO, and SUSAN RUOHONEN, in her Individual Capacity.

## THE PARTIES

1.    PLAINTIFF NICOLE M. BRONSON ("Bronson" or "Plaintiff") is a female, black citizen of the United States of America, and at all times relevant hereto was a resident of Orland Park, Illinois.

2.    DEFENDANT ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL of CHICAGO ("Lurie Hospital"), is an Illinois Not-For-Profit Corporation, licensed to do business within the State of Illinois, with its principal place of business located at 225 E. Chicago Ave., Chicago, Illinois. Lurie Hospital is the largest pediatric provider in the region and provides pediatric care in a setting that offers the latest benefits and innovations in medical

1

technology, research and family-friendly design. Lurie Hospital is 136 years old and employs in excess of 501 employees.

3.     DEFENDANTS, SUSAN RUOHONEN ("Susan"), at all times relevant to the allegations of this complaint, was an agent, servant and/or employee of Lurie Hospital, who was a manager and/or supervisor of Plaintiff.

## JURISDICTION AND VENUE

4.     This is an action for relief from employment discrimination in violation of Title VII of the Civil Rights Act of 1964, *as amended* ("Title VII") as well as violations of Illinois state law.

5.     This Court has jurisdiction over Plaintiff's Title VII pursuant to 28 U.S.C. § 1331 as they arise under the laws of the United States of America.

6.     This Court has supplemental jurisdiction over the related Illinois state law claims pursuant to 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy under Article III of the United States Constitution. Plaintiff's state law claims share common operative facts with her federal law claims. Resolving Plaintiff's federal and state claims in a single action serves the interests of judicial economy, convenience, consistency, and fairness to the parties.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.     Plaintiff timely filed charges of discrimination with the Illinois Department of Human Rights and the United States Equal Employment Opportunity Commission ("EEOC"). (attached hereto as Exhibit "A"). On or around December 30, 2019 the EEOC issued Plaintiff a Notice of Right to Sue Letter. (attached hereto as Exhibit "B")

8.     Plaintiff has timely filed this action and has complied with all administrative prerequisites to bring this lawsuit.

## FACTS RELEVANT TO ALL COUNTS

9.     On August 31, 2018, Bronson was hired by Ms. Tora Evans ("Tora") Manager as a Citywide Hospital and Treatment Center Teacher ("the Position") and Plaintiff received a three-year assignment to Lurie Hospital which assigned ends in 2021.

10. In her current position, Lurie Hospital required Plaintiff to go through their Lurie Hospital employee training, carry a Lurie Hospital identification badge, perform her job duties and operate thru the Lurie Hospital email system, and carry a Lurie Hospital pager.

11. Bronson's immediate supervisor at Lurie Hospital is Susan Ruohonen (White) who is the Senior Director of Family Services. Susan supervisors an entire department, 99% of whom are non-Black.

12. In the Position at Lurie Hospital, Plaintiff oversees eligibility procedures and instruction resources for students who are unable to access classroom instruction as a result of a diagnosed medical or psychiatric condition. Plaintiff also provides instruction to small groups or individually at bedside. Because many patient/students are critically ill, Plaintiff is required to remain focused on academics while being sensitive to the life-threatening conditions such as inoperable brain tumors or devastating side effects of chemotherapy and motor and cognitive issues secondary to traumatic brain injury.

13. Plaintiff is also required to provide appropriate instruction by planning lessons and assignments in collaboration with the student's classroom teacher; to integrate evidence based instructional strategies that infuse technology, art and music in instruction; to manage student records; and create detailed student reports on a frequent basis.

14. There are two other teachers that work for Lurie Hospital in the same position as Plaintiff. Barbara-Lea (Caucasian) who was on maternity leave when Plaintiff began working at Lurie Hospital in August of 2018, and Catherine Cooper (African American) who started work at Lurie Hospital in August of 2018, at the same time Plaintiff began working at Lurie Hospital.

15. Techers who previously occupied the Position were John Navin (Caucasian) and Mary Vokoun (Caucasian). Upon information and belief, Plaintiff and Cooper are the first two Black teachers to occupy the Position at Lurie Hospital.

16. From the start of her employment, Susan treated Plaintiff and Cooper differently and caused other Lurie Hospital employees to treat Plaintiff and Cooper differently from other Teachers who occupied the Position at Lurie Hospital

17.    Teachers who occupy the position at Lurie Hospital are required to create and maintain case management for all students with whom they interact.  Part of the case management includes two forms that must be prepared by the student's parent(s) which provides consent for their student to receive instruction from the teachers in the Position occupied by Plaintiff.  In addition, there are forms which must be completed by a licensed physician or an Advance Practice Nurse. Further, teachers in the Position must have access to information related to dates of admission and the schools where the patient students are enrolled, and whether the student/patients can return to their former schools or require the teachers in Plaintiff's position to provide in home teaching services once the student/patient is released.

18.    The Lurie Hospital EPIC System contains information including the identity of the medical professionals working with the student/patient, the student/patient diagnosis, the student's admission and discharge dates and other helpful information as it relates to health and safety for the teacher and student. Access to the EPIC system is a fundamental element in getting compliance to provide teaching services.

19.    Plaintiff and Cooper were having difficulty performing the tasks required by the Position because they did not have access to the EPIC system.  When Plaintiff inquired about the access, Susan advised that they could not have access to EPIC because it would be a HIPPA violation.  When Plaintiff challenged Susan by stating that previous teachers had access to EPIC, and it was necessary for performance of their job duties, Susan stated it was a "new policy" to refuse access to EPIC by teachers in the Position occupied by Plaintiff and Cooper.

20.    The denial of access to EPIC was inconsistent with Lurie Hospital policy and an action by Susan intended to and did interfere with Plaintiff's ability to perform her job duties. Without access to EPIC Plaintiff and other similarly situated teachers, namely Cooper found it difficult, if not impossible to obtain the parental consent, the Lurie Hospital professional authorization needed to teach, and to coordinate the teaching plan while the patient/student was at Lurie and thereafter based upon whether the student went back to their regular school or needed home teaching after their discharge.

4

21. In the ensuing months after Plaintiff questioned the above denial of access to EPIC by Susan, the treatment of Plaintiff by Susan quickly deteriorated. Susan deliberately denied access to what was required to efficiently do the job as a teacher and then complained to Plaintiff's boss that Plaintiff and Cooper were not committed to nor a good fit to carry out the Position's job responsibilities. Susan knew that EPIC access was a fundamental element in getting compliance needed to provide teaching services.

22. Susan ostracized Plaintiff and Cooper by limiting her contact with them. Specifically, Susan had her administrative assistant Eva Saavedra provide orientation, and required Eva or someone else to provide trainings or relay messages to Plaintiff and Cooper. When Cooper and the Plaintiff had questions regarding information received, Eva was unknowledgeable and could not answer many of the questions and even stated that she didn't understand why Susan had her doing the training because "this was her first time doing the training and she didn't have the experience to train the Plaintiff and Cooper.

23. Susan intentionally mislead Plaintiff and Cooper about access to EPIC because Plaintiff and Cooper were the only teachers in the Position without patient access to EPIC. Prior to Plaintiff and Cooper coming to work at Lurie Hospital, all White teachers in the Position were all provided the access Plaintiff and Cooper were trying to establish and Susan consistently denied. It wasn't until Plaintiff and Cooper arrived at Lurie Hospital that access to EPIC was denied to a teacher.

24. On many occasions over the first year Plaintiff and Cooper were employed at Lurie Hospital, Susan's repeated response to Plaintiff and Cooper was that this was a new policy and they could not have access to EPIC. Plaintiff and Cooper repeatedly explained to Susan that denial of access was creating extreme difficulty in completing case management which was required by CPS prior to teaching our patient/students. Susan appeared unbothered and repeatedly stated that was Lurie Children's Hospital "new policy".

25. Because of the denial of access to EPIC it would take as long 2-3 days for Plaintiff and Cooper to identify and contact individuals and get the required information and

authorizations needed to start teaching the patient/students. On some occasions, patient/students were discharged before Plaintiff and Cooper got the information needed to service them.

26.    In the the ensuing months after Plaintiff began her employment with Lurie and challenged the denial of access to Epic, Plaintiff was subjected to an increasing amount of harassing conduct by Susan.

27.    Susan emailed Tora Evans, Plaintiff's supervisor at CPS asking why Plaintiff needed access to admission and discharge dates for the student/patients the Position required Plaintiff to teach.

28.    On February 26, 2019, Susan sent an email to Tora complaining inter alia that Plaintiff and Cooper,

They don't interact with others on the unit.

They spend a lot of time in their office.

Their attitudes do not reflect our culture here.

Their attitudes are often perceived as:

Passive-aggressive

Better than others"

Annoyed if the patient is not available (when asked if anyone specific, Nicole was named)

Dismissive, and

Not really committed to their service to our patients

29.    As a result of that email, Plaintiff went to the Chicago Teacher's Union and Susan was removed as Plaintiff and Cooper's representative supervisor.   In addition, the Union Representative, Leah Raffanti responded to Susan's email complaining about Plaintiff and Cooper as follows:

Hello Susan,

I am Nicole and Catherine's Chicago Teachers Union Field Representative. I am writing to you to express my concerns with the email you sent to their supervisor, Tora, on February 26, 2019. I've pasted it below for your reference.

The CTU recognizes the special relationship our members have to develop at different locations while servicing CPS students. Certainly, Nicole and Catherine, as well as all other city-wide CPS teachers and clinicians, work tirelessly to ensure CPS students receive all they are owed according to the law while they are unable to attend a traditional school setting.

I would like to clear up a few things regarding CTU members' employment and due process rights. As I hope you are aware, the Chicago Board of Education and the CTU have a union contract that affords our members due process rights and a progressive discipline system, should any member commit an infraction of Board policies or rules. What your "feedback" details below does not, in any way, show any such infractions and is based on unknown data collection and seemingly objective measures. Further, any warranted progressive discipline must be carried out by a member's direct supervisor. I am not sure what your "feedback" was intended to produce with Nicole's and Catherine's supervisor, although your email leads me to the conclusion you were attempting to convince Tora of some kind of infraction. The only person who can initiate any disciplinary action against a CTU member is their supervisor.

The CTU-Board union contract, evaluation (known as REACH) best practices, and REACH handbook have very detailed rules by which members are observed and issued preliminary and summative evaluation scores. Your "feedback" follows no such contract, best practices or handbook. The only person who can complete REACH observations and issue evaluation scores is Tora, or another Board designee. Again, I am not sure what your "feedback" was intended to produce regarding Nicole's and Catherine's quality of work, but it cannot be used in their REACH evaluation, as you are not an employee of the Board.

I truly hope you; Nicole and Catherine can move forward in a positive light. The allegations in your "feedback" are quite contemptuous. Calling into question their attitudes, work ethics, and accusing them of "not really being committed to patients" is insulting. Your patients are their students, and CTU members are nothing, if not dedicated to CPS students. From the email below, it seems like you are in regular communication with their supervisor. I urge you to continue to work this out with her, as your "feedback" has not been received well by the Union or members assigned to work at Lurie.

CTU members have the right to union representation in any meeting with a supervisor they feel may lead to their discipline or termination. These are their Weingarten Rights afforded to them by the National Labor Relations Act. I have advised Nicole and Catherine of these rights.

If you have any further questions, you can reach me at 312-329-6290.

Leah Raffanti

30. On Barbara's first day back at Lurie Hospital, from maternity leave, Cooper noticed that she (Barbara), was wearing a different colored id/badge than Plaintiff and Cooper. Cooper also noticed that Barbara had access to EPIC. Cooper began asking questions around the hospital to find out why the difference badge color and access and EPIC. It was discovered the Barbara's id/badge allowed her regular employee access. Word must have traveled to Susan that Cooper and Plaintiff were asking questions and then a few days later on March 29, 2019, Susan's assistant Eva sent an email asking all CPS Teachers to check the color of their badges. Barbara was then told to turn in her badge and pick up a new one with the same color as Plaintiff and Cooper.

31. It wasn't until September 25, 2019, over a year after Plaintiff started working at Lurie Hospital, after she filed a charge of discrimination with the EEOC, that she swiped her ID badge on a Lurie Hospital computer to check emails for the day and noticed that she was being provided limited access to EPIC.

32. Notwithstanding Plaintiff and Cooper had been pleading for access to EPIC for over a year, Plaintiff was never notified that she was being given limited access to EPIC, Plaintiff and Cooper did not receive limited access to EPIC until

33. Plaintiff's treatment by Susan and others continued to devolve, and the work environment became even more hostile. On one occasion, Plaintiff had an appointment to see a student/patient and entered the patient/student's room. Plaintiff was followed into the patient/student room by a nurse (Sofie) who asked Plaintiff in front of the patient/student and the grandmother, if Plaintiff "could read." The grandmother interrupted and stated she didn't want that kind of discussion going on in front of her daughter and that the daughter could receive teaching at another time.

34. Plaintiff attempted to discuss the encounter with Sofie and thought the matter was resolved. However, shortly thereafter, Susan sent another email to Tora claiming that a parent

had issued a complaint against the Plaintiff. A meeting was held between Plaintiff, Cooper, Sophie and Tora, which meeting revealed that the accusation of a parent complaint was not true.

35.    At another occasion, Lurie Hospital required that all CPS Teachers take HIPPA training as well as other training related to patient confidentiality because the Position required Teachers to have access to confidential patient information. But even after the HIPPA training, Plaintiff and Cooper were still treated by Susan and others as if we are not part of the team.

36.    Not only is maintaining confidentiality imperative as an employee of Lurie Hospital, but as a CPS Teacher maintaining confidentiality is an ethical and professional responsibility.

37.    In the ensuing months after Plaintiff complained to the Teacher's Union and Ms. Raffanti responded in a manner inconsistent with Susan's request, the treatment of Plaintiff by Susan continued to deteriorate.

38.    On numerous occasions Susan continued to deride Plaintiff in front of a group of co-workers. On April 19, 2019, everyone involved with school services were on the 11th floor of Lurie Hospital participating in a photoshoot for the up and coming events that were going to take place during Teacher's Appreciation Week. Susan was present and taking pictures until it was time for the CPS Teachers to take pictures. When Plaintiff and Cooper were called to be photographed, Susan then excused herself from the photo and stated that she had somewhere to be. Plaintiff and Cooper were once again humiliated, offended and felt highly disrespected in front of their peers.

39.    In May of 2019 Tora received an email from Susan stating that the CPS Teachers would no longer have the office space and the location on the 19th floor, due to organizational changes and that all teachers were now being moved to a location on the 12th floor, which was a shared space with family services and the hospital interns. Since that time Plaintiff and Cooper have not received dedicated office space, must carry their materials around in boxes and work from wherever they can find space.

40.    Plaintiff and Cooper's main concern with the office space issue was that they did

not have sufficient room for the student folders/files which contain sensitive medical information (HIPAA) and a place where they might store their books and teaching materials/manipulatives (i.e. math manipulatives, science kits, office supplies, story books, construction paper, etc.).

41.    On behalf of Plaintiff and Cooper, Tora sent an email to Susan that stated in part, I am being proactive because, as you know, my teachers are collective bargaining members and pursuant to CPS/Chicago Teachers' Unit (CTU) contract, all teachers must have "adequate workspace." Below is the specific language outlined in the CPS/CTU contract relative to this topic.

> The BOARD shall provide adequate workspace for all PSRP's including citywide PSRPs, appropriate to their job duties. The workspace shall include, at a minimum, a desk, chair, access to a computer, working copiers, printers and telephones.

42.    On August 28, 2019 CPS Citywide team had a collaborative meeting at the start of the school year. Tora informed all teachers that each site administrators were provided a CPS Citywide Hospital Teacher Workspace survey. The survey was provided to ensure all Teachers have access to appropriate and adequate workspace. Tora said that all Site Administrators agreed that the spaces were adequate and appropriate and she as well as the CTU were provided a copy of said document. She also informed teachers that after arrival to sites, if they discovered their work site was inadequate, the teacher was to inform her immediately.

43.    Upon arrival to Lurie Hospital Plaintiff discovered that Barbara's materials were already secured at one of the 2 desk spaces provided for all 3 CPS teachers. Since Barbara arrives later than Plaintiff and Catherine, it was difficult to understand how that was possible.

44.    Despite being constantly harassed and regularly demeaned by her direct supervisor, being denied access to information necessary to properly perform job duties and adequate workspace, Plaintiff attempted to continue to perform proficiently the job functions for which she was responsible.

45.    A telephone conference was held with Tora on October 3, 2019: Plaintiff had to

call separately due to the conference call not working on a CPS phone assigned to her and her personal cell phone charged per minute for that particular conference number. On the conference call Tora explained that Susan was requesting one of the three CPS teachers be removed considering there was no office/working space. Susan's request was being made, despite the fact that the census data report clearly showed that with 3 teachers present, there are still oftentimes not enough hours in the day to provide instruction and allotted time for CPS patient/students.

46.     Tora expressed that Dr. Jones, Chief for the Office of Diverse Learners and Support Services (African American), told her to ask if anyone would be willing to volunteer to be relocated to another hospital. Plaintiff expressed to Tora that space was no longer an issue because she made do with what she was provided over the past 2 months and would continue to make do.

47.     Plaintiff also expressed that she already knew that Susan no longer wanted Plaintiff to remain at Lurie Hospital, as expressed in the previous emails Susan sent about Plaintiff not being "a good fit at Lurie" and Bronson's "attitude not fitting the climate of the hospital." Plaintiff also expressed to Tora, that if removing her from Lurie and placing her somewhere else would stop Susan from harassing her then Tora should do what is necessary to keep the collaboration between Lurie Hospital and CPS and also to keep Plaintiff's stress level down because it was now affecting Plaintiff's health.

48.     Tora then went on to explain to Plaintiff that Susan stated that she was compiling an email charging Plaintiff with alleged HIPPA violations and wanted her email to be placed in Plaintiff's personnel file. Bronson again expressed to Tora that she did not understand how the email she sent violated HIPPA when everyone who received Plaintiff's email had access to the information contained within the email. Susan is the Family Services Director at Lurie. Her teachers Scott and Katie are the ones that provide CPS an email Census report of which Plaintiff is certain Susan receives a copy. Tora is Bronson's administrator and Julie is Tora's administrator. Every week Tora has all Citywide Hospital and Treatment Center Teachers email and share data about every student seen at Lurie Hospital. This information is entered into a

student data form. Not only is Tora seeing this information on a weekly basis, Julie has access as well. Plaintiff expressed to Tora that if Susan sends another email that is in an attempt to discipline the Plaintiff, that Plaintiff will in fact contact the Chicago Teacher Union, as well as a private attorney.

49.     Plaintiff also expressed to Tora that she believed the harassment and hostile work environment to which she was subjected was based upon race, and that she would be filing a racial discrimination and hostile work environment charge with the EEOC against Susan. Plaintiff also expressed that she was under an enormous amount of stress due to all of things going on at Lurie Hospital.

50.     Later that day Bronson had a doctor's appointment (Podiatrist) due to excessive pain in her feet, the result of walking long distances while carrying heavy boxes because she had no designated workspace.  As a part of the doctor's examination, Bronson's blood pressure was taken, and was recorded at 140/98; Plaintiff's normal blood pressure averages 117/70.

51.     Plaintiff's treatment by Susan continued to devolve. On October 4, 2019 Plaintiff logged in via telephone as always to see if she had any pages on my hospital pager, only to learn that her access was denied.   Later that day, all 3 CPS teachers met to discuss the conference call with Tora. After meeting, Barbara sent an email to Tora on behalf of all 3 CPS Teachers:

> Thank you so much for having two phone conferences with us to update us on the progress of collaborative talks with Susan and Teri here at Lurie.  I always appreciate your great efforts to keep us informed and in the loop as much as possible.  Catherine, Nicole and I were able to have a discussion as a team, and we all agree that Lurie Children's Hospital most definitely needs to have three CPS Hospital teachers on-site, versus only two, if we want to be able to provide educational services for the CPS students that are inpatients throughout the school year (not to mention providing them with the hour of school time they are legally entitled to).  I believe this is why you fought so hard and collected data showing the great need here for a third teacher back in 2017!
>
> Overall, I think that the workspace and storage issues have been resolved, for the most part, except for one bin of teaching supplies/decorations, and when I saw Susan the other day, she mentioned she may have a place for us to store them.  The only other issue is that, as we see more students while the year progresses, we will run out of (locked) space for our student files, even if we only hold onto our frequent flyers (which are many).

Thank you, again, for your ongoing support of us, our students, and of the great work of this entire program throughout Chicago.

Sincerely Yours,
Barb

52.     After the meeting, Plaintiff wasn't feeling well and was starting to experience tightness in her chest as well as feeling off balance. Bronson went upstairs to the patient floor on 21 and asked one of the nurses, Carol if she could take her blood pressure. Carol provided a blood pressure reading for Plaintiff of 138/90.

53.     On December 12, 2019 Plaintiff filed her charge of discrimination with the Illinois Department of Human Rights and the EEOC against Lurie Hospital. (See Exhibit "A") On December 30, 2019, the EEOC issued a Notice of Right to Sue Letter. (See Exhibit "B")

54.     As time passed, SUSAN continued to single out Plaintiff for discriminatory treatment. Plaintiff was subjected to efforts by Susan to discipline, reassign and/or terminate her for conduct for which other employees were not punished and for complaints of harassment, and disparate treatment.

## COUNT I:  HOSTILE WORK ENVIRONMENT

55.     Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above.

56.     To prove that an employment environment actionably hostile under Title VII, "a plaintiff must show that (1) he was subject to unwelcome harassment; (2) the harassment was based on race (or another protected category); (3) the harassment was severe or pervasive to a degree that altered the conditions of employment and created a hostile or abusive work environment; and (4) there is a basis for employer liability." *Gates v. Bd. of Educ. of Chi.*, 916 F.3d 631, 636 (7th Cir. 2019)

57.     SUSAN subjected Plaintiff to harassing conduct in that she withheld access

necessary for Plaintiff to perform her job, denied her the work space necessary to perform her job, continually and unjustifiably disparaged Plaintiff over the entire course of her employment with Lurie Hospital, openly stating that Plaintiff was not a good fit for the Lurie Hospital culture had a bad attitude and was not really committed to the service of the Lurie Hospital patients.

58.     SUSAN 's harassing conduct and disparaging remarks were unwelcome; Plaintiff in no way solicited or incited the harassing conduct at issue.

59.     SUSAN purposefully perpetrated the harassing conduct detailed above because Plaintiff is African American.

60.     The accumulated incidents detailed above of denial of access, disparagement, humiliation, and other offensive behavior, subjected Plaintiff to all the trappings of a hostile work environment. SUSAN 's behavior was so severe and pervasive that it irretrievably altered the conditions of Plaintiff's employment.

61.     Plaintiff perceived this environment to be abusive; and, because of the harassing behavior, Plaintiff's coworkers perceived that she, in effect, was inferior because of her race, and that she had become *persona non grata* with SUSAN. This led them to eschew social interaction with Plaintiff during breaks or lunch out of fear of incurring adverse consequences. This clearly demonstrates that a reasonable person in Plaintiff's position would find the environment hostile and abusive.

62.     Due to its open and obvious nature, Lurie Hospital knew, or should have known, that SUSAN was engaging in discriminatory and hostile conduct.

63.     As a result of Defendant's behavior, Plaintiff has been damaged in her career and to her person and her otherwise suffered mental anguish, emotional distress and monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, NICOLE M. BRONSON, demands judgment against the Defendant, LURIE HOSPITAL as follows:

A.  Compensatory damages;

B.  Mental anguish and emotional distress;

C.  Prejudgment interest, attorneys' fees, and costs;

D.  For such other and further relief, as is just and equitable.

## COUNT II: VIOLATION OF TITLE VII DISCRIMINATION BASED UPON RACE

64.  Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above.

65.  Title VII of the Civil Rights Act of 1964, as amended, prohibits discrimination in employment practices and specifically 42 U.S.C. § 2000e-2 provides in pertinent part:

> "**(a) Employer practices**
> It shall be an unlawful employment practice for an employer— (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;"

66.  During the course of her employment, Plaintiff was subjected to harassment, as well as differential terms and conditions of employment by Lurie Hospital's agent SUSAN, and attempted discharge, because of her race, African American.

67.  SUSAN 's conduct as previously alleged at length herein and described constitutes discrimination based upon race in direct violation of Title VII.

68.  As a result of Defendants' discriminatory conduct, Plaintiff has been damaged in her career and reputation and otherwise suffered monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NICOLE M. BRONSON, demands judgment against the Defendant LURIE HOSPITAL as follows:

A.  For an award of $300,000 in compensatory damages suffered because of the discrimination;

B.    Plaintiff's injury to her career, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages and fringe benefits;

C.    For attorney's fees and costs of this suit, pursuant to applicable statute; and

D.    For such other and further relief, as is just and equitable.


## COUNT III: DEFAMATION

69.    Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above.

70.    SUSAN, in the scope of her employment with Lurie Hospital, falsely reported to CPS officials as previously alleged at length herein and described above including but not limited to an allegation that Plaintiff had violated the HIPPA rules and that a permanent allegation of said charge needed to be placed in Plaintiff's personnel file.

71.    SUSAN made all of the above allegations with knowledge of their falsity.

72.    Plaintiff was damaged in that she had to proceed to a hearing on the alleged allegations detailed above including allegations of her violation of the HIPPA charges.

73.    Plaintiff was further damaged in her career and to her person and has otherwise suffered monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, NICOLE M. BRONSON, demands judgment against the Defendants, LURIE HOSPITAL and SUSAN in an amount in excess of $300,000.00 for damages sustained, together with punitive damages and the costs of this action. And for such other and further relief, as is just and equitable


## COUNT IV: VIOLATION OF 42 U.S.C. § 1981 DISCRIMINATION BASED UPON RACE

74.    Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above.

75.    Title 42 U.S.C. § 1981 provides in pertinent part:

"(a) Statement of equal rights

 All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

 (b) "Make and enforce contracts" defined

For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(c) Protection against impairment

The rights protected by this section are protected against impairment by nongovernmental discrimination …"

76.     At all times herein mentioned, Plaintiff was a person protected by the provisions of 42 U.S.C. § 1981.

77.     The claims against the Defendants herein are based upon discrimination based upon race.

78.     SUSAN, as Plaintiff's direct supervisor at Lurie Hospital, had an intent to discriminate against Plaintiff on the basis of race.

79.     The discrimination complained of by the Plaintiff concerned one or more of the activities enumerated in the statute includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

80.   As a result of Defendants' discriminatory conduct, Plaintiff has suffered injury to her career, as well as emotional pain and suffering, inconvenience, mental anguish and loss of

enjoyment of life, and for other losses for which she is entitled to compensatory damages in accordance with 42 U.S.C. § 1981.

81.     Venue is appropriate as Plaintiff's residence, and Defendants residence and business, as well as all events giving rise to this claim occurred within the counties served by this Court.

82.     At all times herein mentioned, Plaintiff was a person protected by the provisions of 42 U.S.C. § 1981.

83.     Defendants deprived Plaintiff of her rights to make and enforce contracts granted to her by statutes of the United States when they deliberately and intentionally discriminated against her based upon her race by setting in place a campaign designed to, and did, result in Plaintiff's harm.

84      Defendants maintain a widespread practice of treating Black employees, (based upon their race) especially Plaintiff less favorably than her co-workers who are not Black.

85.     Although the practice is not authorized by written law or express company policy, the practice of discrimination in the nature of disparate treatment, denial of transfer of her position, workplace defamation, fraudulent inducement, harassment, humiliation, and the creation of a hostile work environment is so permanent and well-settled as to constitute a custom and/or usage with the force of law.

86.     Defendants' practices represent a widespread practice of racial discrimination, especially towards Blacks.

87.     Plaintiff was treated less favorably than her colleagues because she is Black, caused by an existing, unwritten, unconstitutional policy, which is directly attributable to a final policymaker.

88.     The final policy makers for Defendant Lurie Hospital include SUSAN, and other members of management.

89.     Plaintiff alleges a pattern of conduct that gives rise to a plausible claim that an unconstitutional custom, pattern or practice exists.  Specifically, Blacks who occupy the position of Teacher are treated differently and denied the same opportunities as their Caucasian counterparts because of discriminatory animus and intent.

90.     This supports Bronson's claim of having suffered adverse employment actions by conduct tantamount to bullying, arbitrary and inconsistent directives, denial of access to items necessary for the performance of her job duties, demeaning and humiliating assignments, intentional and public humiliation, unwarranted discipline, and denial of transfer.

91.     Bronson has been employed by LURIE HOSPITAL since August, 2018 she entered into an agreement for employment with LURIE HOSPITAL, as a Teacher.

92.     Plaintiff at all times material to this Complaint proved her industriousness, presented and represented herself in an orderly and respectful manner and commanded and continues to command the respect of her fellow employers.

93.     Additionally, BRONSON demonstrated her capacity and abilities to perform all job tasks to which she was assigned.

94.     Rather than support BRONSON in her position of Teacher Defendant LURIE HOSPITAL intentionally discriminated against BRONSON in the ways set forth above and for retaliating against her for complaining about discrimination against her while working at  LURIE HOSPITAL.

95.     LURIE HOSPITAL's intentional discriminatory animus through the actions of its employees SUSAN, and other members of management, all based upon race.

96. LURIE HOSPITAL knew about or reasonably should have known about the hostile work environment created by SUSAN, and other members of management and other management employees, and failed to take appropriate remedial action to protect BRONSON.

97. SUSAN and other members of management, intentional discrimination interfered with BRONSON'S right to enforce her agreement with LURIE HOSPITAL including the performance, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

98. As a result of the Defendant LURIE HOSPITAL'S, discrimination based upon race, BRONSON has suffered injury to her career, as well as emotional pain and suffering, inconvenience, mental anguish and loss of enjoyment of life, and other losses for which she is entitled to compensatory damages in accordance with 42 U.S.C. § 1981.

WHEREFORE, Plaintiff BRONSON demands judgment against the Defendant LURIE HOSPITAL, and SUSAN, and other members of management as follows:

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment against Defendants LURIE HOSPITAL, and SUSAN, in her individual capacity, as follows:

A. For an award of $300,000 in compensatory damages suffered because of the discrimination; Plaintiff's injury to her career, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages and fringe benefits;

B. For attorney's fees and costs of this suit, pursuant to applicable statute; and

C. For such other and further relief, as is just and equitable.

## COUNT V: TORTIOUS INTERFERENCE WITH A CONTRACT

100. Plaintiff incorporates by reference all of the allegations set forth in paragraphs 1 through 54 above.

101.    To prove tortious interference with a contract, a plaintiff generally must allege: (1) the existence of a contract between the plaintiff and a third party,(2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages to the Plaintiff.   *DBS Constr., Inc. v. New Equip. Leasing, Inc.,* 2011 U.S. Dist. LEXIS 32681, at \*11 (N.D. Ind. Mar. 28, 2011).

102.    Plaintiff is a teacher under contract with Chicago Public Schools and currently assigned to Lurie Hospital as a Citywide Hospital and Treatment Center Teacher.

103.    Defendants are aware that Plaintiff is under contract with CPS and is further protected by the Chicago Teacher's Union ("CTU") as part of her contract rights with CPS because several CTU representatives have communicated with Susan regarding her attempts to discipline and or have Plaintiff reassigned and/or terminated from her employment.

104.    On numerous occasions as detailed above, Susan intentionally mislead the Plaintiff as to Lurie Hospital policies and procedure, intentionally withheld from the Plaintiff authorization and access to information necessary for the performance of her job duties under the contract, denied Plaintiff adequate workspace wherein she could protect confidential medical records for her patient/students (which she was required by law to do) and otherwise perform her job duties which actions on the part of defendants severely interfered with Plaintiff's performance  and/or, in certain instances rendered contract performance impossible.

105.    In addition, on many occasions Defendants attempted to induce CPS to discipline, reassign and/or terminate the plaintiff, or otherwise deny her due process and the right to progressive discipline guaranteed her under her contract with CPS.  Defendants' inducements were based upon accusations of misconduct, impropriety, poor work quality, violations of the HIPPA laws, poor attitudes, questionable work ethics, and lack of commitment to the patients, sent as a letter of complaint via email to Plaintiff's CPS supervisor and intercepted by Plaintiff's

CTU representative, all of which accusations were inappropriate, false, known to be false when made, and totally outside of defendants' authority.

106.    As a result of Defendants' tortious conduct, Plaintiff has been damaged in her career and reputation and otherwise suffered monetary damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff NICOLE M. BRONSON, demands judgment against the Defendant LURIE HOSPITAL and SUSAN as follows:

A.    For an award of $300,000 in compensatory damages suffered because of the discrimination; Plaintiff's injury to her career, emotional pain and suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary damages and fringe benefits;

B.    For punitive damages in an amount in excess of $500,000.00;

B.    For attorney's fees and costs of this suit, pursuant to applicable statute; and

D.    For such other and further relief, as is just and equitable

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all causes of action and claims to which she has a right to a jury trial.

Dated:  March 31, 2020

Respectfully submitted,

NICOLE M. BRONSON

By;    s/ Calvita J. Frederick
       Attorney for Plaintiff

Calvita J. Frederick
Post Office Box 802976
Chicago, Illinois 60680-2976
312-421-5544
ARDC # 6184001