**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS EASTERN DIVISION**

| | | |
|---|---|---|
| **NICOLE M. BRONSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 20 C 2077** |
| **v.** | ) | |
| | ) | **Judge John Z. Lee** |
| **ANN & ROBERT H. LURIE CHILDREN'S HOSPITAL OF CHICAGO, an Illinois NFP Corporation, and SUSAN RUOHONEN, in her Individual Capacity,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**MEMORANDUM OPINION AND ORDER**

Nicole Bronson, a Black teacher for Chicago Public Schools ("CPS"), has been assigned to work as a Citywide Hospital and Treatment Center Teacher at Ann & Robert H. Lurie Children's Hospital of Chicago ("Lurie") since 2018. Bronson alleges that Lurie and its Senior Director of Family Services Susan Ruohonen (collectively, "Defendants") have subjected her to discrimination and harassment on the basis of her race during her assignment, thereby violating her rights under Title VII, 42 U.S.C. § 1981, and Illinois state law. Now before the Court is Defendants' motion to dismiss the complaint with prejudice. For the reasons that follow, the motion is granted, except insofar as the Court dismisses Count III without prejudice after relinquishing supplemental jurisdiction over it.

## I. Background[1]

Bronson is and was at all relevant times a teacher under contract with CPS and a member of the Chicago Teachers Union ("the CTU"). *See* Compl. ¶¶ 9, 27–29, 102–03, ECF No. 1. In August 2018, she was assigned by her CPS supervisor, Tora Evans, to work as a Citywide Hospital and Treatment Center Teacher on site at Lurie for three years. *Id.* ¶ 9; *see also id.* ¶ 29. In this position, Bronson provides instruction to students who are unable to access classroom instruction due to a diagnosed medical or psychiatric condition. *Id.* ¶ 12. In addition to Bronson, two other CPS teachers filled the same position at Lurie during Bronson's tenure: Barbara Lee, who is white, and Catherine Cooper, who is Black. *Id.* ¶ 14. Ruohonen, who is Lurie's Senior Director of Family Services, serves as the teachers' "representative supervisor" at the hospital. *Id.* ¶¶ 3, 29; *see also id.* ¶ 11 (calling her an "immediate supervisor").

Bronson alleges that, from the start of her assignment at Lurie, Ruohonen treated her and Cooper—the first Black CPS teachers ever to occupy their position, *id.* ¶ 15—differently than Lee and other CPS teachers served in that position, *id.* ¶ 16. This allegedly discriminatory treatment began right from the beginning, when neither Bronson nor Cooper were given access to Lurie's electronic medical records system, called "EPIC." *See id.* ¶¶ 14, 17–20. When Bronson asked Ruohonen why she and Cooper—unlike every other CPS teacher who had come before them—did not have access to EPIC, Ruohonen said that it was due to a new policy at Lurie meant to prevent violations of the Health Insurance Portability and Accountability Act

---

[1] The Court "accept[s] as true all well-pleaded facts alleged" in reviewing a motion to dismiss. *See Tamayo v. Blagojevich*, 526 F.3d 1074, 1081 (7th Cir. 2008).

("HIPAA"). But Bronson and Cooper were the only teachers without access to EPIC, *id.* ¶¶ 19, 23–24, and that lack of access makes it more time-consuming for Bronson and Cooper to obtain medical information needed to prepare a student's course of instruction. *Id.* ¶ 25.

Bronson claims that, after she questioned her lack of access to EPIC, Ruohonen subjected her to an increasing amount of harassing conduct. *Id.* ¶ 26. For instance, on February 26, 2019, Ruohonen emailed Evans with a list of complaints about Bronson and Cooper, including allegations that "[t]heir attitudes do not reflect our culture here" and they were "[n]ot really committed to their service of our patients." *Id.* ¶ 28. In response, a CTU representative, Leah Raffanti, told Ruohonen that her allegations were "contemptuous" and "insulting," and that her attempt to provide "feedback" was not well received. *Id.* ¶ 29. Raffanti also advised Ruohonen that, under the collective bargaining agreement (the "CBA") entered into between CPS and the CTU, which governed the terms of CTU members' employment, "[t]he only person" who could initiate discipline against a member, terminate a member, or even evaluate a member's work performance was "their [CPS] supervisor"—in this case, Evans. *See id.* As a further result of Ruohonen's email, the CTU removed her as Bronson and Cooper's representative supervisor. *Id.*

On another occasion, Bronson was interrupted during an appointment with one of her students by a nurse who asked her, in front of the student and the student's grandmother, whether she could read. *Id.* ¶ 33. On yet another occasion, in April 2019, Ruohonen humiliated Bronson and Cooper by suddenly excusing herself from

taking a picture with them during a photoshoot for Teacher's Appreciation Week. *Id.* ¶ 38. Bronson and Cooper also initially received identification badges from Lurie that were in different colors than those of other CPS teachers. *Id.* ¶ 30.

In May 2019, Ruohonen sent an email to Evans informing her that, due to organizational changes at Lurie, CPS teachers would have their office space relocated from its location on the 19th floor to a location on the 12th floor that was shared with Family Services and hospital interns. *Id.* ¶ 39. In response, Evans insisted to Ruohonen that, pursuant to the terms of the CBA, all CPS teachers were entitled to "adequate workspace," including "at a minimum a desk, chair, access to a computer, working copiers, printers and telephones." *Id.* ¶ 41. Evans raised this topic in a meeting with the teachers at the start of the next school year, in August, stating that CPS's site administrators had all agreed that the new workspaces "were adequate and appropriate" and asking the teachers to "inform her immediately if they discovered their work site was inadequate." *Id.* ¶ 42. Upon arriving at Lurie, however, Bronson found that Lurie had provided only two desk spaces for all three teachers and that one of the desks had already been reserved for Lee, even though she arrived to work last. This left Bronson and Cooper to share the remaining desk space. *See id.* ¶¶ 40, 43. Instead of raising the issue with Evans, however, Bronson "made do with what she was provided." *See id.* ¶ 46.

In a conference call on October 3, 2019, Evans informed the teachers that Ruohonen had requested one of them to be reassigned to another hospital due to the reduced workspace at Lurie and asking for a volunteer. *Id.* ¶ 45. While expressing

to Evans that space "was no longer an issue," Bronson said she would volunteer if doing so "would stop [Ruohonen] from harassing her." *Id.* ¶¶ 46–47. In response, Evans added that Ruohonen had said she was drafting a HIPAA complaint against Bronson and wanted it to be placed in Bronson's personnel file; Bronson denied committing a HIPAA violation. *Id.* ¶¶ 48–49.

The teachers met to discuss the conference call amongst themselves later that day. In the end, they had Lee email Evans on behalf of all three to say that Lurie "definitely needs to have three CPS Hospital teachers on-site" and to confirm that the workspace issues "have been resolved." *Id.* ¶ 51. Bronson continues to be assigned to Lurie.

Bronson filed this case after receiving a Notice of Right to Sue Letter from the Equal Employment Opportunity Commission in December 2019. *Id.* ¶ 53. Her complaint brings five counts. Count I alleges that Defendants subjected Bronson to a hostile work environment, in violation of Title VII. *Id.* ¶¶ 55–63. Count II alleges that Defendants discriminated against Bronson on the basis of her race, also in violation of Title VII. *Id.* ¶¶ 64–68. Count IV alleges racial discrimination as well, this time in violation of 42 U.S.C. § 1981. *Id.* ¶¶ 74–98. Count III alleges that Defendants defamed Bronson by reporting false information to CPS, including with regard to the HIPAA complaint. *Id.* ¶¶ 69–73. Count V alleges that Defendants tortiously interfered with Bronson's employment contract with CPS. *Id.* ¶¶ 100–06.

Defendants' motion to dismiss the complaint with prejudice is now before the Court. *See* Defs.' Mot. Dismiss ("Mot."), ECF No. 16.

## II. Legal Standard

To survive a motion to dismiss under Rule 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

Determining whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. Moreover, while courts "must take all of the factual allegations in the complaint as true" for purposes of a motion to dismiss, they are "not bound to accept as true a legal conclusion couched as a factual allegation." *Papasan v. Allain*, 478 U.S. 265, 286 (1986). Accordingly, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" to state a claim under Rule 12(b)(6). *Iqbal*, 556 U.S. at 678.

## III. Analysis

Defendants raise a host of arguments for dismissing Bronson's complaint in its entirety. The Court begins with Bronson's federal claims, then turns to her state law claims.

## A. Title VII (Counts I and II)

Defendants argue that Bronson's Title VII claims must be dismissed because Lurie is not her employer. Tacitly conceding that Lurie is not her *direct* employer, Bronson counters that it can be held liable as her *de facto* employer.

The threshold element of any Title VII claim is "the existence of an employer-employee relationship." *Love v. JP Cullen & Sons, Inc.*, 779 F.3d 697, 701 (7th Cir. 2015). Although Title VII claims are typically asserted against an employee's "direct" employer, it is "well established in this circuit" that a plaintiff "may have multiple employers for purposes of Title VII liability," and may, "under certain limited circumstances, bring a claim against a defendant who is not his direct employer." *Id.* (citing *Tamayo*, 526 F.3d at 1088; *EEOC v. Illinois*, 69 F.3d 167, 169 (7th Cir. 1995)).[2]

The Seventh Circuit uses a five-factor test to determine whether a defendant is a "*de facto* or indirect employer." *Id.* at 701–02 (cleaned up); *see Knight v. United Farm Bureau Mut. Ins. Co.*, 950 F.2d 377, 378–79 (7th Cir. 1991). These factors are:

> (1) the extent of the employer's control and supervision over the employee; (2) the kind of occupation and nature of skill required, including whether skills were acquired on the job; (3) the employer's responsibility for the costs of operation; (4) the method and form of payment and benefits; and (5) the length of the job commitment.

*Love*, 779 F.3d at 702 (citing *Knight*, 950 F.2d at 378–79).

---

[2] It is also well established in this circuit "that a supervisor does not, in his individual capacity, fall within Title VII's definition of employer." *Sattar v. Motorola, Inc.*, 138 F.3d 1164, 1168 (7th Cir. 1998) (cleaned up). Thus, to the extent Counts I and II are brought against Ruohonen in her individual capacity, they are dismissed with prejudice.

In examining these factors, the Court must consider "both how much control [Lurie] exerted over [Bronson], and also what the economic realities of their relationship were." *Id.* (clarifying that the *Knight* factors are "an operationalization of the 'economic realties' test" attributed to *EEOC*, as opposed to a separate test). The Seventh Circuit has stressed that "the employer's right to control is the 'most important' consideration in ascertaining the existence of an employer-employee relationship." *Id.* at 703 (quoting *Knight*, 950 F.2d at 378). "Thus, if an employer has the right to control and direct the work of an individual, not only as to the result to be achieved, but also as to the details by which that result is achieved, an employer/employee relationship is likely to exist." *Alexander v. Rush N. Shore Med. Ctr.*, 101 F.3d 487, 493 (7th Cir. 1996), *as amended on denial of reh'g and reh'g en banc* (Feb. 7, 1997) (cleaned up). The court also has emphasized that, "when control is examined, 'the key powers are, naturally, those of hiring and firing.'" *Love*, 779 F.3d at 703 (quoting *EEOC*, 69 F.3d at 171).

Bronson relies on the following allegations to show that Lurie was her *de facto* employer: (1) that she was assigned to work on-site at Lurie for three years, Compl. ¶ 9; (2) that Lurie required her to complete unspecified hospital "training," carry a hospital identification badge and a hospital pager, and use a hospital email account, *id.* ¶ 10; (3) that Lurie controlled instruments and tools relevant to her position, like its EPIC medical records system, although Bronson did not have access to it, *id.* ¶ 18; (4) that Ruohonen was her immediate supervisor at the hospital, *id.* ¶ 11; (5) that Bronson was bound by hospital policies, especially those pertaining to HIPAA rules,

and had to undergo HIPAA training, *see id.* ¶¶ 19, 35; (6) that Lurie provided her (or failed to provide her) with adequate workspace, *see id.* ¶ 39; (7) that Ruohonen attempted to have one of the teachers reassigned to another hospital, *id.* ¶ 45;[3] and (8) that Ruohonen attempted to have a HIPAA complaint placed in her personnel file.

These allegations fall short of establishing that Defendants were Bronson's *de facto* employer. For starters, none of them establish the sort of control that the Seventh Circuit has emphasized: the ability to hire, fire, or direct an employee's work. *See Love*, 779 F.3d at 703. To the contrary, Bronson concedes that it was CPS who hired her, CPS who assigned her to a three-year stint at Lurie, and CPS alone who could fire or even discipline her. *See* Compl. ¶¶ 9, 29. Moreover, Bronson's allegation that only CPS could evaluate her work, and that even Ruohonen's attempt to provide constructive "feedback" was not "received well" by the CTU, *see id.* ¶ 29, bolsters the conclusion that Lurie had no right to direct Bronson's work, neither "as to the result to be achieved" nor "as to the detailed by which that result is achieved," *see Alexander*, 101 F.3d at 493. And, although Bronson highlights that Ruohonen *attempted* to have CPS reassign a teacher to another facility and *attempted* to have CPS initiate discipline against Bronson, these allegations merely underscore that Lurie lacked "the key powers" of control over her and the other on-site CPS teachers. *See EEOC*, 69 F.3d at 171.

[3] Although Bronson contends that Ruohonen specifically sought to have *her* reassigned to another hospital, the allegations show that she merely presumed that to be the case given their history. *See* Compl. ¶¶ 45, 47.

Furthermore, Bronson overstates the minor measures of control or supervision she does ascribe to Lurie. For instance, although Bronson alleges that Ruohonen was her "immediate supervisor" at the hospital, Compl. ¶ 10, the CTU characterized her as Bronson's "representative supervisor"—suggesting that she *represented* a non-employer—while referring to Evans as Bronson's *true* "supervisor"—the one with sole power to evaluate, discipline, reassign, and terminate, *see id.* ¶ 29. That the CTU readily removed Ruohonen as Bronson's representative supervisor as a result of her February 26, 2019 email, further demonstrates Lurie's lack of meaningful supervision or control over Bronson. *See id.*

In addition, while Lurie necessarily exercised some control over the teachers' workspace (the teachers were stationed there after all), even that control was minimized by the oversight of Evans, who ensured that the new workspaces were found to be "adequate and appropriate" by CPS's site administrators. *See id.* ¶¶ 41–42. As for Lurie's control over EPIC, that Bronson was *denied* access under the hospital's new HIPAA policy underscores the extent to which she was not treated like a hospital employee. As to the remainder of the allegations on which Bronson relies, they are consistent with the kind of security procedures that any hospital would require of on-site workers, regardless of employment status.

Bronson likewise fails to show that the other *Knight* factors, which go to the "economic realities" of the relationship, demonstrate that Lurie was her *de facto* employer. *See Love*, 779 F.3d at 702–03. She does not allege that Lurie helped her to acquire skills for her job, that Lurie was responsible for any of the costs of

operation, or that Lurie had anything to do with the method or form of her payments or benefits. And although the length of Bronson's assignment at Lurie was substantial, the more salient point is the Lurie had no control over the terms of her assignment and no power of its own to reassign her or any other CPS teacher.

In sum, the complaint fails to indicate that Lurie was Bronson's *de facto* or indirect employer for purposes of Title VII. And given the affirmative allegations in the complaint that established that CPS alone held all of "the key powers" of control and supervision, *see EEOC*, 69 F.3d at 171, the Court does not believe that Bronson could fare better in an amended complaint. Accordingly Counts I and II are dismissed with prejudice. *See Bogie v. Rosenberg*, 705 F.3d 603, 608 (7th Cir. 2013) ("Leave to amend need not be granted . . . if it is clear that any amendment would be futile.").

**B. 42 U.S.C. § 1981 (Count IV)**

Bronson's other federal claim arises under § 1981, which grants "[a]ll persons within the jurisdiction of the United States . . . the same right in every State and Territory to make and enforce contracts," among other activities. 42 U.S.C. § 1981(a). For purposes of this provision, "the term 'make and enforce contracts' includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." *Id.* § 1981(b). To state a claim under § 1981, a plaintiff must show (1) that she is a member of a racial minority, (2) that the defendant had an intent to discriminate on the basis of race; and (3) that the discrimination concerned one or more of the

activities enumerated in the statute—here, the making and enforcing of a contract. *Morris v. Office Max, Inc.*, 89 F.3d 411, 413 (7th Cir. 1996).

Defendants argue that Bronson fails to satisfy the third element of a § 1981 claim because she cannot show that any alleged discrimination interfered with her right to make or enforce contracts. In Bronson's view, she has sufficiently alleged that Defendants interfered with her right to adequate workspace under the terms of the CBA between CPS and CTU because of her race, before the start of the 2019 school year. *See* Compl. ¶¶ 41, 97, 102–04.

The Seventh Circuit has recognized that "a third party's interference" with a plaintiff's right to make or enforce a contract with another can support a claim under § 1981. *Shaikh v. City of Chi.*, 341 F.3d 627, 630 (7th Cir. 2003) (citing *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969) (holding that the right to lease under 42 U.S.C. § 1982, which courts have interpreted in tandem with § 1981, "is protected . . . against the actions of third parties, as well as against the actions of the immediate lessor"); *Faraca v. Clements*, 506 F.2d 956, 959 (5th Cir. 1975) (reading *Sullivan* to encompass "a third party's interference with th[e] rights guaranteed under Section 1981")). While *Shaikh* derived this rule from *Sullivan*, the court noted that *Sullivan* "did not discuss what type of action it anticipated would constitute third-party interference." *Id.* at 630–31. However, recognizing that "the concept of third-party interference with contractual or business relationships . . . is a well-recognized common-law tort," the court turned to Illinois law (which governed the state law issues in that case) and asked whether the plaintiff had sufficiently alleged

tortious interference for purposes of § 1981. *Id.* at 631–32 (finding that he had not); *see also Muhammad v. Oliver*, 547 F.3d 874, 878 (7th Cir. 2008) (reiterating in dicta "that tortious interference with contract rights violates section 1981 when the motivation for the interference is racial").

Here, however, Bronson has not adequately alleged that Defendants tortiously interfered with her contractual right to adequate workspace under the CBA. "To state a cause of action for tortious interference with a contractual relationship, a plaintiff must establish (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages. *Complete Conference Coordinators, Inc. v. Kumon N. Am., Inc.*, 915 N.E.2d 88, 93 (Ill. App. Ct. 2009). What is missing here is the allegation that Defendants induced a party to the CBA—namely CPS—to breach the provision entitling Bronson to adequate workspace. *Cf. Mitchell v. Weiger*, 409 N.E.2d 38, 41 (Ill. App. Ct. 1980) (noting that "inducement to breach contract involves acts aimed at parties other than a plaintiff"). To the contrary, Bronson's theory is that Defendants themselves failed to abide by that provision, even though they were not parties to the CBA.[4]

[4] Although Bronson's response brief does not mention them, the complaint also asserts that, by taking "many" other alleged discriminatory acts, such as Ruohonen's efforts to have her disciplined by CPS, Defendants "attempted to induce CPS" to breach Bronson's rights under the CBA. *See* Compl. ¶ 105. Because an attempt to induce a breach of contract is not sufficient to state a claim of tortious interference under Illinois law, these allegations do not support Bronson's § 1981 claim. *See Peco Pallet, Inc. v. Nw. Pallet Supply Co.*, No. 15 C 06811, 2016 WL 5405107, at *13 (N.D. Ill. Sept. 28, 2016). As for Bronson's argument that Defendants' actions rendered performance of her employment contract "impossible," the

Even assuming *arguendo* that interference with a contractual relationship means something broader for purposes of § 1981 than for purposes of Illinois common law, the complaint still fails to state a claim. Notably, Bronson's workspace complaints ignore the fact (which Bronson concedes) that Evans sent an email to Ruohonen on behalf of the teachers to vindicate their contractual right to "adequate workspace" ahead of the 2019 school year, Compl. ¶ 41, and that, as a result, the site administrators all certified in writing to her and the CTU that the new workspaces "were adequate and appropriate," *id.* ¶ 42. And while Bronson now maintains that Defendants nonetheless failed to provide her with an adequate workspace, she not only declined Evans's invitation to raise that issue with her, *see id.*, but expressed to Evans "that space was no longer an issue" during their October 3, 2019, conference call. *Id.* ¶ 46; *see also id.* ¶ 51 (reiterating Bronson's agreement "that the workspace . . . issues have been resolved," except for one issue not raised in this suit). Given this, it is difficult to see how Bronson can claim that Defendants prevented her from enforcing her right to adequate workspace.

Accordingly, the complaint fails to establish a violation of § 1981. And because the Court finds that any amendment of the claim would be futile, Count IV is dismissed with prejudice as well.[5] *See Bogie*, 705 F.3d at 608.

---

factual allegations in the complaint fall short of indicating that this was the case. *See* Compl. ¶ 104; *cf. George A. Fuller Co. v. Chi. Coll. of Osteopathic Med.*, 719 F.2d 1326, 1330 31 (7th Cir. 1983) (recognizing that "rendering performance impossible," as opposed to merely rendering it more burdensome, can satisfy the breach element of tortious interference under Illinois law).

[5] Because the Court has dismissed Bronson's federal claims with prejudice for the reasons given above, it need not address Defendants' remaining arguments on these claims.

### C. State Law Claims (Counts III and V)

That leaves Bronson's state law claims of defamation and tortious interference with contract. Defendants argue that the complaint fails to state these claims as well. Since the Court has dismissed Bronson's federal claims with prejudice, however, "the usual practice" would be to relinquish supplemental jurisdiction over her state law claims pursuant to 28 U.S.C. § 1367(c)(3) and dismiss them without prejudice. *See Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999).

That said, this case presents an unusual circumstance warranting the exercise of supplemental jurisdiction over one of Bronson's state law claims. *Cf. Miller Aviation v. Milwaukee Cty. Bd. of Supervisors*, 273 F.3d 722, 732 (7th Cir. 2001) (reviewing "exceptions to th[e] general rule"). The Seventh Circuit has held "that when 'the district court, in deciding a federal claim, decides an issue dispositive of a pendent claim[,] there is no use leaving the latter to state court.'" *Id.* at 731 (quoting *Wright v. Associated Ins. Cos., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994)). And here, in dismissing Bronson's § 1981 claim, the Court necessarily found that Bronson cannot state a claim of tortious interference under Illinois law because the complaint shows that Defendants did not induce any breach of contract, as discussed above. Thus, because "federal-state comity is certainly not served by sending back to state court doomed litigation that will only be dismissed once its gets there," the Court dismisses Count V with prejudice. *See Groce*, 193 F.3d at 502 (cleaned up). Count III does not suffer from the same deficiency and, thus, it is dismissed without prejudice for lack of supplemental jurisdiction under § 1367(c)(3).

## IV. Conclusion

For the foregoing reasons, Defendants' motion to dismiss is granted in part and denied in part. Bronson's federal claims (Counts I, II, and IV), as well as her tortious interference claim (Count V), are dismissed with prejudice, while her defamation claim (Counts III) is dismissed without prejudice for lack of jurisdiction. Judgment will be entered accordingly in favor of Defendants. This case is terminated.

**IT IS SO ORDERED.**

**ENTERED 3/18/21**

**John Z. Lee**
**United States District Judge**